

**ORDERED in the Southern District of Florida on January 10, 2012.**

_____

A. Jay Cristol, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Case No.: 09-16850-AJC |
| ALEJANDRO ANTONINI, | Chapter 7 Case |
| Debtor. | |
| _____/ | |
| FRANKLIN D. DURAN, | Adv. No.: 10-03792-AJC |
| Plaintiff, | |
| vs. | |
| ALEJANDRO ANTONINI, | |
| Defendant. | |
| _____/ | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER: (A)
DETERMINING 303(i) DAMAGES; (B) DETERMINING DEBT TO BE EXEMPT
FROM DISCHARGE; AND (C) DENYING DEBTOR'S DISCHARGE</u>**

1

THIS MATTER came before the Court for trial on October 3, 2011 and on November 2, 2011. Upon consideration of the evidence, the record, the candor and demeanor of the witnesses and the argument of counsel, the Court makes the following findings of fact and conclusions of law.[1]

## INTRODUCTION

Franklin Duran ("Duran" or "Plaintiff") sued Alejandro Antonini ("Antonini" or "Debtor") in a six count complaint. Count I seeks to liquidate compensatory damages as a result of the filing of an involuntary petition against Duran pursuant to 11 U.S.C. §303(i)(1)[2]. Count II seeks to liquidate bad faith damages pursuant to §303(i)(2). Count III is an objection to discharge pursuant to §727(a)(2)(A). Count IV is an objection to discharge pursuant to §727(a)(4)(A). Count V is an objection to discharge pursuant to §727(a)(3). Count VI[3] seeks to except the debt owed Duran from discharge pursuant to §523(a)(6).

## THE EVIDENCE

The Court considered the testimony of the following witnesses: Duran, Antonini, Allison Day, Esq. ("Day"); Mr. Pedro Ramirez ("Ramirez"); and Mr. Carlos Eduardo Salinas Rodriguez ("Salinas"). Charles W. Throckmorton, Esquire ("Throckmorton") testified as an expert witness on the reasonableness of Duran's attorneys' fees. The Court received into the evidence the following Plaintiff's exhibits: 1-8, 12-28, and 30-35[4]. The Court received into evidence the following defense exhibits: A-AA, CC, DD, II, JJ, KK, LL, MM, OO, PP, SS, TT, and CCC[5].

---

[1] To the extent that the Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the Court intends that they be considered as such.

[2] All statutory references, unless otherwise indicated, are to 11 U.S.C. §101, *et seq*. (the "Bankruptcy Code").

[3] Count VI, the §523 count, is incorrectly numbered as a duplicate Count V, for the purposes of this opinion it will be referred to as "Count VI."

[4] Exhibits 32 and 33 were admitted without the photographs that were part of those composite exhibits.

[5] Prior to the commencement of the trial, each of the foregoing defense exhibits was admitted, without objection, pursuant to that Order dated September 2, 2011 [D.E.91/92]. At trial, Antonini did not introduce any other exhibits into evidence.

Upon careful consideration of the foregoing, the Court makes the following findings of fact and conclusions of law.

**<u>FINDINGS OF FACT</u>**

1.      Duran and Antonini were friends for many years. *Transcript* 24-1; 100:10-14; 163-64; 166:15. Antonini, through his wholly-owned company Venuz Supply Inc. ("Venuz"), provided purchasing services for many of the companies that Duran owned or with which he was involved. *Transcript* 15-16:25-15; 16:12-24; 164:9-13.

2.      Duran, a citizen of the nation of Venezuela, was convicted in United States District Court on November 3, 2008 of being an unregistered foreign agent in violation of United States law and sentenced to 48 months in federal custody. *Transcript* 137:22-25; 138:2-5; *Exhibit PP*. Duran was released after serving 41 months of his sentence. *Transcript* 138:19-25. He was released from federal custody in July of 2011, approximately three months before the first day of trial in this adversary proceeding. *Transcript* 138:19-25. At the time of trial Duran was subject of deportation proceedings as a result of overstaying his visa and was free on bond pending the resolution of those proceedings. *Transcript* 139:5-24.

**A. The Involuntary Petition**

3.      On December 5, 2008, Antonini and Venuz commenced an involuntary bankruptcy (*In re Duran, Alleged Debtor*, 08-28580-AJC) (the "Duran Involuntary Case") against Duran alleging that: (a) Duran owed them $281,000 and $360,950.76, respectively; (b) Duran was not generally paying his debts as they came due; and (c) they were eligible to commence the involuntary. *Exhibit 1* (the "Involuntary Petition").

3

4.    Antonini signed the Involuntary Petition (*Exhibit 1*) individually and on behalf of Venuz under penalty of perjury. *Transcript* 17:4-11.

5.    No other creditor joined the Involuntary Petition. *Transcript* 25:1-4.

6.    On December 5, 2008, the **same** day that he filed the Involuntary Petition, Antonini made a sworn statement in state court litigation that "Duran, meanwhile, **who has a net worth in excess of $100 million,** can well afford to prosecute a baseless lawsuit such as this." *Exhibit 3* at P. 11.

7.    Antonini knew at the time of filing the Involuntary Petition that Duran had a net worth of $100 million or more. *Transcript* 27-29.

8.    Prior to filing the Involuntary Petition Antonini did little, if anything, to determine whether Duran was generally paying his debts as they became due. *Transcript* 22-24:21-3.

9.    He did not run a credit report on Duran. *Transcript* 18-19:23-3. He did not run a lien search. *Transcript* 20-21:16-2. He never investigated whether Duran was being sued by any other creditors. *Transcript* 21-22:14-20.

10.   Antonini attached three exhibits to the Involuntary Petition. *Exhibit 1* p.3-5. These exhibits are dated November 20, 2008 (the "Summaries"). They purport to be summaries of invoices that Antonini and Venuz issued to Duran and that Antonini claims Duran did not pay.

11.   Prior to the filing of the Duran Involuntary Case, Antonini made no written demand for payment of the amounts listed on *Exhibit 1* p. 3-5. *Transcript* 38:21-22.

12.   On November 21, 2008, Antonini and Venuz sued Duran in federal district court, *Exhibit 2,* (the "Federal Civil Case"). The Summaries are exhibits to the complaint commencing

4

the Federal Civil Case.  Antonini prepared the Summaries in anticipation of and for the purpose of using them in the Federal Civil Case. *Transcript* 32:14-23; 32-33:24-17.

13.  Antonini filed the Involuntary Petition before Duran's time to respond to the complaint in the Federal Civil Case had expired. *See Transcript* 36:6-9; Fed. R. Civ. P. 12(a)(permitting a defendant 21 days to file a response pleading after service).

14.  The first summary, "Summary Exhibit A", asserts that Duran owes Venuz $360,950.76 for goods allegedly purchased by Venuz for Duran or his benefit between December 20, 2006 and July 18, 2007. Antonini admitted that Venuz and Duran never had a written agreement. *Transcript* 42:6. Antonini never received a purchase order from Duran personally. *Transcript* 42:24-25. Venuz did not operate from the address listed at the top of Summary Exhibit A during the time the goods were purportedly purchased for Duran or his benefit. *Transcript* 43:12-15. Summary Exhibit A lists an address for Venuz that Venuz did not use until 2008, long after the debt was purportedly incurred.  Summary Exhibit A was prepared in anticipation of litigation and without any supporting documentation.  This exhibit is not credible.

15.  The second summary, "Summary Exhibit B", asserts that Duran owes Antonini $216,000. Antonini claims these monies are due to him for management services provided to an entity called Klim Petro Inversiones ("Klim"). *Transcript* 45:18-24. However, to the extent such a relationship did exist it would be governed by some agreement. Antonini produced no evidence of an agreement, written or otherwise. *Transcript* 46-47:19-18. Summary Exhibit B was likewise prepared in anticipation of litigation, without any supporting documentation to show that Duran was responsible for any alleged debt.

Lastly, the address listed for Antonini at the top of the summary is not his address but, rather, a post office box leased by Venuz starting in 2008.   The exhibit is not credible.

16.   The third summary, "Summary Exhibit C", asserts that Duran owes Antonini $65,000.00 because Duran agreed to pay Antonini $5,000 a month to keep Duran's vacation home in Key Biscayne, Florida "party ready." *Transcript* 50:2-5. Antonini testified that by "party ready" he meant that Antonini was to assure that the house was ready to receive guests with ice in the cooler, meat in the freezer and wine in the wine cooler. *Transcript* 50-51:2-3.   There is no written agreement that memorializes this understanding between Duran and Antonini. *Transcript* 51:4-8. Duran disputes that he hired Antonini for this purpose. *Transcript* 147:14-20.   Duran asserts that, to the extent Antonini did in fact provide any services to Duran relating to the home, he did so for free, out of friendship. Antonini's recorded statement to Christian Lovera stated that he had taken care of Duran's house for free. *Transcript* 55:7-9. Summary Exhibit C was likewise prepared in anticipation of litigation and without any supporting documentation.   It too lists an incorrect address for Antonini.  The exhibit is not credible.

17.   Antonini knew that Duran disputed the alleged debts because after filing the Federal Civil Case, but prior to filing the Involuntary Petition, Duran told Antonini that he did not owe the debts that Antonini claimed. *Transcript* 34:22-25; *Exhibit 2* p.4.

18.   Antonini filed the Involuntary Petition so that he could collect the money that he alleged Duran owed him and Venuz. *Transcript* 25:5-9. Antonini testified it was the "best" way to get his money. *Transcript* 26:12-15.

19.   Duran testified that he did not owe Antonini any money on December 5, 2008. *Transcript* 140:16-18; 140-146. He also testified that he was paying his debts as they came due.

6

*Transcript* 147-48:24-6.  He testified that as of December 5, 2008, he had no litigation pending against him alleging that he owed money. *Transcript* 148:8-11.   Duran's testimony is credible.

20.    Duran filed an answer to the Involuntary Petition and reserved his right to seek damages pursuant to §303(i). *Exhibit 35*.

21.    Prior to the hearing on Duran's answer to the Involuntary Petition, Venuz and Antonini commenced their own chapter 7 bankruptcies on April 8 and 15, 2009, respectively.

22.    The Court dismissed the Involuntary Petition on September 3, 2009, without the consent of Duran, preserving in the dismissal order Duran's right to seek relief under § 303(i). *Exhibit 8*.

### **B. The E*Trade Account**

23.    In September of 2006 Antonini and his wife maintained an account with Smith Barney (the "Smith Barney Account"). That same month, Antonini deposited approximately $1.6 million into the Smith Barney Account. *Transcript* 65:8-11; 66:2-25; *Exhibit 3* p. 6 and Exhibit B contained therein; *Exhibit 16*.   The funds used to make this deposit were exclusively his, not his and his wife's.  *Exhibit 3*.

24.    Prior to filing his own chapter 7 bankruptcy case, Antonini also had an interest in an E*Trade Account ending in 9434 (the "E*Trade Account"). *Exhibit 19*.

25.    On March 24, 2008 Antonini wrote to E*Trade directing the transfer of all the funds from the Smith Barney Account to the E*Trade Account. *Exhibit 14*.

26.    As of April 30, 2008, the E*Trade Account had a balance of $770,264.20. *Exhibit 19*. This money came from the Smith Barney Account. *Transcript* 64-65:22-7.

7

27.    Antonini had signatory authority on the E*Trade account and referenced it in correspondence with E*Trade as "my" account. *Exhibit 14*; *Transcript* 62:15-25.

28.    On March 13, 2009, approximately one month prior to filing his chapter 7 bankruptcy case, Antonini signed *Exhibit 15*, directing E*Trade to remove his name from the E*Trade Account. *Exhibit 15*; *Transcript* 68:1-13; 70:12-21.  He acknowledged that by doing so he was "losing his ownership" in the E*Trade Account.  *Id.*

29.    Even after Antonini instructed E*Trade to remove his name from the E*Trade Account his tax liability was still paid from the E*Trade Account. *Exhibit 21.*

### C. The Checks from Mrs. Rengualt to Antonini

30.    On April 16, 2008, Mrs. Rengualt, Antonini's wife, wrote him a check for $298,761.66. *Exhibit 20.* Antonini deposited the check into the E*Trade Account. The endorsement on the check states "For deposit in the acc# [XXXXXXX] of Alejandro Antonini in etrade." *Exhibit 20*.

31.    On the same day, Mrs. Rengualt wrote another check for $71,408.56 made payable to her, not Antonini, and which was also deposited in the E*Trade account. This endorsement states "For deposit in the acc# [XXXXXXX] of Jacqueline Rengualt in etrade." *Exhibit 20*.

### D. Antonini Failed To Maintain Books and Records of the E*Trade Account

32.    On December 30, 2009, Duran first served Antonini with a notice of taking a Fed. R. Bankr. P. 2004 ("Rule 2004") examination. *Exhibit 22.* The examination notice required Antonini to produce

> All canceled checks, bank statements, check stubs, check registers, bank deposit slips, passbooks, and certificates of deposits on all bank accounts, savings accounts, brokerage accounts and money market accounts (collectively, the

8

> 'Accounts') maintained by the Debtor, any Accounts that
> the Debtor has an interest in or appeared as a signatory on
> in the four years prior to the petition date.

33. On June 25, 2010, August 24, 2010, and November 2, 2010, Duran served Antonini with re-notices of taking Antonini's Rule 2004 examination *duces tecum*. The notices contained the same language as the August 24, 2010 notice requesting documents.

**34.** Notwithstanding the notices, Antonini never produced any documents related to the E*Trade Account. *Transcript* 85:22-9.

### E. Antonini Fails To Disclose His Interest in Various Watches

35. On November 15, 2010 Antonini appeared for deposition. He was asked "In the last five years have you had any interest in any Rolex watch?" His answer at the deposition was "Yes, sir." Antonini further identified the Rolex as "a Rolex submariner" he recalled acquiring in 2002 and paying approximately $3,000.00 for it. *Transcript* 90-91:23-11. At his deposition Antonini further testified that he had no other interest in a Rolex watch in the last five years. *Transcript* 92:1-11.

36. At trial, however, Antonini admitted that he never disclosed during his deposition the existence of an additional Rolex watch he acquired in 2006. *Transcript* 92:12-14. The undisclosed Rolex cost Antonini about $21,000.00. *Transcript* 92:21-23; *Exhibit 33.*

### F. Duran's Damages

37. Duran testified that he suffered damages as a result of the Involuntary Petition. *Transcript* 148:12-15. Duran testified that he paid approximately $200,000 in fees and costs to Berger Singerman P.A. in connection with the defense of the Involuntary Petition. *Transcript* 161:11-12. Duran also testified that the Involuntary Petition damaged his reputation. *Transcript* 161-62:24-9. After filing the Involuntary Petition, Antonini also

filed a motion to appoint an interim trustee for Duran. *Exhibit 5*.  Duran testified that he had to retain lawyers outside of the United States to manage the fallout from Antonini filing a motion for the appointment of an interim trustee. *Transcript* 162:14-25.  Duran testified he paid these lawyers a total of $250,000.00, *Transcript* 163:2-6, but offered no documentation or other reliable evidence in support of this testimony.

38.    Duran's expert witness, Throckmorton, credibly testified that this was not an ordinary case and there were unique circumstances. *Transcript* 201-02:9-10. The unique circumstances identified by Throckmorton included the language barrier between Duran and his counsel, the highly skilled counsel representing Antonini, the existential threat to a vast economic network that was impaired by having its leader subject to the Involuntary Petition and the fact that Duran was incarcerated. *Id.* Throckmorton opined that Duran's reasonable legal fees for the services of Berger Singerman P.A. should be $175,000.00 plus costs. *Transcript* 198:24.

39.    Antonini presented no expert testimony on the reasonableness of Duran's fees.

### G. Antonini's Credibility and Motivation

40.    Antonini's testimony lacks credibility.  For instance, he stated for the first time, only after he prepared for the continued day of trial, that he filed the Involuntary Petition to protect Duran's assets for all creditors. This is inconsistent with his testimony on the first day of trial where he stated that he filed the Involuntary Petition to collect the money allegedly owed to him by Duran. *Transcript* 281-82:8-14.

41.    At the continued trial Antonini testified that he spoke with Ramirez as part of his due diligence prior to filing the Involuntary Petition. *Transcript* 268-69:13-15. He claimed that Ramirez told him that Duran owed him money. This is inconsistent with Antonini's

testimony during the first day of trial where he testified that he did not rely on any information from Ramirez in making the decision to file the Involuntary Petition. *Transcript* 132-33:25-2.

42.   Moreover, Antonini testified that his answers to certain interrogatory questions, under oath, were correct. Namely, that Ramirez and Salinas told Antonini that Duran owed each of them money. In each case Antonini claims that he was told that Duran owed each of them more than $1,000,000.00. *Transcript* 284-286; *Transcript* 289-90:21-17.

43.   However, Ramirez and Salinas testified to the contrary on rebuttal.  Ramirez testified that he did not tell Antonini that Duran owed him $1,000,000.00. *Transcript* 295:4-9. Although the Court finds Ramirez's testimony as to how he came to testify at trial to be suspicious, the Court is persuaded that Ramirez did not tell Antonini that Duran owed him $1,000,000.00.   Similarly Salinas, who the Court finds to be candid and straightforward, testified that as of December 5, 2008 Duran did not owe him any money. *Transcript* 305:16-18. Both of these witnesses directly contradict the testimony given by Antonini at trial and the responses in his Interrogatories about which he was questioned.

## CONCLUSIONS OF LAW

The matters before the Court are "core" matters pursuant to 28 U.S.C. §157(b)(2)(A), (B), (I), and (J). Venue is proper before the Court pursuant to 28 U.S.C. §1409(a). Jurisdiction is proper before this Court pursuant to 28 U.S.C. §1334(a) and (b); and the General Order of Reference entered July 11, 1984. *See* S.D.Fla Local  R. 87.2.

The Court must rule on the following issues:

(1) Count I- What measure of damages, if any, should be awarded to Duran pursuant to §303(i)(1)?

11

(2) Count II- What measure of damages, if any, should be awarded to Duran pursuant to §303(i)(2)?

(3) Count III- Did the Debtor transfer assets with the intent to hinder, delay or defraud his creditors in order to warrant a denial of his discharge pursuant to §727(a)(2)(A)?

(4) Count IV- Did the Debtor make a false oath or account to warrant denial of his discharge pursuant to §727(a)(4)(A)?

(5) Count V- Did the Debtor fail to maintain his business records to warrant denial of his discharge pursuant to §727(a)(3)?

(6) Count VI- Did the Debtor cause Duran a willful and malicious injury such that the damages awarded under Counts I and II are non-dischargeable pursuant to §523(a)(6)?

Prior to trial the Court issued an extensive ruling striking many of the Antonini's affirmative defenses. *See* [D.E. 53 and D.E. 71]. Additionally, the Court denied the Antonini's Motion to Dismiss/Strike in an order dated September 1, 2011 [D.E. 89], this resolved the 18th affirmative defense. Therefore, Antonini was left with the following defenses and counterclaim at the time of trial: Laches, Unclean Hands, Set-Off, and Violation of the Automatic Stay.

### Count I  Compensatory Damages Pursuant to §303(i)(1)

The award of damages in every involuntary petition is "contingent in every case on three prerequisites: (1) the court must have dismissed the petition; (2) the dismissal must be other than a consent by all petitioners and the debtor; (3) the debtor did not waive its right to recovery under the statute." *In re Lee*, 252 B.R. 565, 565 (Bankr. M.D. Fla. 2000). All three requirements ("Common Requirements") have been met in this case. "Once the debtor demonstrates that the involuntary case was dismissed, the burden shifts to the petitioning creditors to present evidence to disallow an award of fees. In that sense, the award of fees is 'routine' insofar as the award

should be made unless the petitioners demonstrate otherwise based upon the totality of the circumstances." *In re Ross*, 135 B.R. 230, 238 (Bankr. E.D. Pa. 1991); *In re Leach*, 102 B.R. 805, 808 (Bankr. D. Kan. 1989)("Although the award of attorney's fees and costs is discretionary, section 303(i)(1) routinely contemplates the award of costs and attorney's fees to the debtor"); *In re Ballato*, 252 B.R. 553, 558 (Bankr. M.D. Fla. 2000)("whether with a bad faith finding or not an involuntary debtor's motion for attorney's fees and costs under Sec 303(i)(1) raises a rebuttable presumption in favor of the Debtor that fees and costs are authorized.").

Section 303(i) provides that after the dismissal of an involuntary bankruptcy case the court may grant judgment against the petitioners and in favor of the alleged debtor for "a reasonable attorney's fee." Under 303(i) the requirement is only that the request for fees be "reasonable." Fees awarded under §303(i) are an element of damages, not professional compensation. *In re Val W. Poterek & Sons, Inc.*,169 B.R. 896, 907 (Bankr. N.D. Ill. 1996)("the award of attorney fees under §303(i)(1) is not professional compensation; it is an award of damages."); *In re Better Care*, 97 B.R. 405, 413 (Bankr. N.D. Ill 1989)("under §303(i) the fees are assessed only as one of the items of damages."). The difference in treatment between professional compensation (§330) and damages (§303(i)) is material because proof of damages "need not be shown with mathematical certainty." *Id* at 907.

Duran has established the Common Requirements. *See Exhibit 8*. The Court dismissed the Involuntary Petition without the consent of Duran. Duran preserved his rights to recover damages pursuant to §303(i). The dismissal order, *Exhibit 8*, is final and non-appealable. Accordingly, the Court finds that Duran is entitled to recover damages under §303(i). The Court also finds Throckmorton's testimony to be credible and reasonable. He opined that $175,000 was a reasonable fee. Upon consideration of the testimony and evidence, the Court agrees and

awards Duran damages of $175,000 in fees relating to the services Berger Singerman P.A. provided in defending the Involuntary Petition.    Additionally, Duran is entitled to $10,000 in costs that were expended during that same time period.

The Court declines to award Duran the $250,000.00 in fees he alleges he paid to lawyers in Venezuela because the Court finds evidence of that expenditure is woefully lacking.  No invoices were introduced or authenticated to establish the services provided and the rate for such services, to enable the Court to determine if same were necessary and reasonable.  Accordingly, Duran's total damage award pursuant to §303(i)(1) is $175,000.00, plus $10,000.00 costs, less any amount he recovers on account of his $350,000.00 allowed claim against the estate of Venuz. *Exhibit CCC* (noting that as of the time of trial Duran was scheduled to receive $130,895.11 from the Venuz bankruptcy).  At trial, Antonini presented no evidence on the amount, if any, that Duran had received as a distribution on account of his allowed claim in the Venuz bankruptcy case.  The damages awarded to Duran shall be reduced by the amount, if any, Duran actually receives as a distribution in the Venuz case and the final judgment of this Court shall so provide.

### Count II Bad Faith Damages Pursuant to §303(i)(2)

If the preponderance of the evidence shows that that the involuntary petition was filed in bad faith, then "bad faith damages" may be awarded. *In re Schloss*, 262 B.R. 111, 116 (Bankr. M.D. Fla. 2000). Pursuant to §303(i)(2) if the Common Requirements are met and the petition was filed in "bad faith," then a court may grant judgment against any petitioning creditor(s) for (A) any damages proximately caused by such a filing; or (B) punitive damages. The Bankruptcy Code does not define the term "bad faith". *In re Apache Trading Group*, 229 B.R. 891, 892-93 (Bankr. S.D. Fla.1999).

14

In the October 26, 2011 *Order Denying Defendant's Ore Tenus Motion For Judgment On Partial Findings* [D.E.106] ("October 26 Order") the Court identified 5 different tests for determining whether an involuntary petition had been commenced in bad faith: (1) the subject test; (2) the improper purpose test; (3) the objective test; (4) the improper use test; and (5) the combined test/Rule 9011 test. [D.E. 106] at 7. As further noted in the October 26 Order, the Eleventh Circuit has specifically recognized the improper purpose test, the improper use test and the Rule 9011 test. *Id*. There is no requirement that the alleged debtor meet all of the above tests before an award of damages under §303(i)(2) can be made. *Id.* Rather, if any one of the tests is met the Court may make an award of "bad faith damages" under §303(i)(2).

Upon the trial of the facts in this case, this Court is persuaded there is indeed sufficient evidence to support the finding that Antonini filed the Involuntary Petition in bad faith. Antonini's bad faith is evidenced by, *inter alia*, the following:

(1)     Antonini swore out an affidavit the same day he filed the Involuntary Petition wherein he stated that Duran had a **net worth** in excess of $100 million.

(2)      Antonini conducted no due diligence as to whether Duran was generally paying his debts as they came due. Antonini conducted no diligence on Duran's financial condition.

(3)     The alleged debts that Antonini claims Duran owes him were not established by the evidence; the documents submitted by Antonini were prepared in anticipation of litigation and are not reliable.

(4)     Antonini knew that Duran disputed the debts.

(5)     The Involuntary Petition was filed because, according to Antonini, it was the "best" way to collect the money allegedly due him from Duran.

The subjective test and the improper purpose test focus on the petitioner's motive for filing an involuntary bankruptcy. An improper motive, such as harassing the debtor or collecting an unpaid obligation, is subjective evidence of bad faith. *In re Apache Trading Group*, 229 B.R at 893; *accord Gen. Trading Inc., v. Yale Materials Handling Corp*., 119 F.3d at 1502 (defining the "improper purpose test" as "where the filing of the petition was motivated by ill will, malice or the purpose of embarrassing or harassing the debtor."). Antonini admitted that he filed the Involuntary Petition to collect an unpaid obligation and, worse yet, without doing any meaningful diligence on Duran's financial condition or whether he was generally paying his debts as they came due. Accordingly, under this test Antonini filed the Involuntary Petition in bad faith.

The objective test requires the Court to assess whether a reasonable person in the creditor's position would have acted as the petitioning creditors did. *In re Apache Trading Group*, 229 B.R at 893 (reasonableness of petitioners' action scrutinized). Courts determine the "reasonableness" requirement to mean that the alleged debtor needs to show that the petitioning creditor "did not conduct a reasonable inquiry into the law and the facts surrounding the case prior to filing the involuntary petition." *In re Dino's*, 183 B.R. 779, 783 (Bankr. S.D. Ohio 1995). Antonini did not conduct any reasonable due diligence regarding Duran's financial condition prior to filing the Involuntary Petition.  He knew Duran disputed the debts; Antonini's federal court lawsuit indicated that the alleged debts were contingent. He also made a sworn statement on the same day he filed that Duran had a net worth of more than $100 million.

In addition, Antonini's own counsel at the time he filed the Involuntary Petition did not sign the petition. Finally no other creditor of Duran joined in the Involuntary Petition. Accordingly, under this test Antonini filed the Involuntary Petition in bad faith.

The improper use test looks at whether the creditor's conduct takes disproportionate advantage of other creditors. This test finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures to obtain a disproportionate advantage for itself, rather than to protect against other creditors obtaining advantages. The quintessential example of improper use is when the petitioner could have advanced its own interests in a different forum. *In re Apache Trading Group*, 229 B.R at 893. An "involuntary petition is clearly not a substitute for customary collection procedures." *In re Schloss*, 262 B.R. 111, 117 (Bankr. M.D. Fla. 2000). Accordingly, courts have held that it is bad faith to file an involuntary when there are state or federal court remedies available. *In re Smith*, 243 B.R. 169, 198-99 (Bankr. N.D. Ga. 1999)(petitioning creditor's failure to exhaust state law remedies constituted bad faith). Antonini filed the Federal Civil Case, predicated on the same alleged debts that then formed the basis for his filing the Involuntary Petition. Thus, Antonini not only had an option other than bankruptcy, be he exercised it and then abandoned it for the Involuntary Petition. The Court finds Antonini's filing of the Involuntary Petition to be in bad faith.

The combined test or Rule 9011 test evaluates bad faith by the subjective and objective standards contained in Rule 9011 of the Federal Rules of Bankruptcy Procedure. *In re Apache Trading Group*, 229 B.R at 893. This test is merely a combination of the subjective test and the objective test. The Court having found bad faith to have been exhibited under both the subjective and objective tests, under this test, the Court likewise finds the involuntary petition to have been filed in bad faith.

Based upon the foregoing the Court will impose punitive damages on Antonini in the amount of $50,000.00 for his bad faith filing of the Involuntary Petition. This amount is intended

4061666-3

to punish Antonini for the bad faith filing based upon Antonini's personal financial net worth. The foregoing award is in addition to the compensatory damages.

### Count III The Denial of Discharge Pursuant to §727(a)(2)(A)

To deny a debtor's discharge under § 727(a)(2)(A), the objecting party must prove by a preponderance of the evidence that: (1) a transfer occurred; (2) the transfer was of debtor's property; (3) the transfer was within one year of the petition, and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. To find fraudulent intent, the Court may consider circumstantial evidence or can infer it from the debtor's action. 'Badges of Fraud' are strong indicators of fraudulent intent. These 'Badges of Fraud' include: (1) lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events. Extrinsic evidence of fraud, for purposes of defeating discharge, can be comprised of conduct intentionally designed to materially mislead or deceive creditors about a debtor's position; conveyances for less than fair value; or continued retention, benefit, or use of property allegedly conveyed together with evidence that conveyance was for inadequate consideration. *See Moecker v. Strasnick (In re Strasnick)*, 256 B.R. 330, 337-38 (Bankr. M.D. Fla. 2000).

It is undisputed that Antonini had an interest in the E*Trade Account. The opening account statement bears his name and lists him as an account holder. He deposited $1.6 million to the Smith Barney Account. On March 24, 2008 Antonini wrote to E*Trade regarding the status of the transfer of funds from the Smith Barney Account to his E*Trade Account. On April 16, Antonini deposited a check in the amount of $298,761.66 made payable to him in the

E*Trade Account. However, less than 30 days before filing his own bankruptcy case, he transferred the E*Trade Account to his wife, notwithstanding that he had his own funds in the account and that his tax liability continues to be paid from the E*Trade Account. The E*Trade Account contained funds belonging to Antonini.

The transfer to his wife of the E*Trade Account was within the 1 year prior to Antonini's chapter 7 filing. The Transfer was done to hinder and delay Duran and Antonini's other creditors. There was no apparent consideration given to Antonini for the transfer even though his money was transferred from the Smith Barney Account to the E*Trade Account. The transfer to his wife was made on the eve of bankruptcy and after Antonini was facing liability to Duran for filing the Involuntary Petition.

Accordingly, the Court finds based upon the evidence that Antonini transferred his interest in the E*Trade Account to his wife with the intent to hinder, delay and defraud his creditors, including Duran within the meaning of 727(a)(2)(A). For this reason the Court denies Antonini a discharge.

### Count IV- The Denial of Discharge Pursuant to §727(a)(4)(A)

To sustain an objection to discharge under § 727(a)(4)(A), the following elements must be proven by the objecting party: (i) the debtor made a statement under oath; (ii) such statement was false; (iii) the debtor knew the statement was false; (iv) the debtor made the statement with fraudulent intent; (v)  and, the statement related materially to the bankruptcy case. *In re Van Den Heuvel*, 125 B.R. 846  (Bankr. S.D. Fla. 1991).

Antonini made several false statements in these proceedings with respect to his interest in the E*Trade Account and his purchase of a $21,000 Rolex watch in 2006.

At trial, Antonini testified that the E*Trade account was his wife's account. *Transcript* 59:1-4. This testimony is false. Antonini transferred $1.6 million of his money into the Smith Barney Account. *Transcript* 65:8-11; *Exhibit 3* p.6 and exhibit B contained therein; *Exhibit 16*. He then caused all of the proceeds of the Smith Barney account to be transferred to the E*Trade Account. In fact, it was he who issued written instructions directing the transfer of all funds to the E*Trade account. *Exhibit 14.* Later, Antonini deposited a check made out to him for $298,761.66 into the E*Trade Account. Antonini was able to use the E*Trade Account, even after he had his name removed from the E*Trade Account, to pay his tax liabilities. Antonini also failed to disclose his interest in various watches at his deposition in this case. Antonini "remembered" purchasing a Rolex watch in 2002 for approximately $3,000, but failed to recall he spent approximately $21,000 to purchase another Rolex in 2006.

Antonini made these false statements with the requisite fraudulent intent. Each of these false statements was material. The Court determines that all of the elements of §727(a)(4)(A) have been met and accordingly denies the Debtor's discharge.

### Count V The Denial of Discharge Pursuant to §727(a)(3)

"To prevail here, [a creditor] must show that [the debtor] failed to maintain books and records or destroyed records from which his financial condition could be ascertained." *European Am. Bank v. Lapes (In re Lapes)*, 254 B.R. 501,505 (Bankr. S.D. Fla. 2000). Courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs. The discharge in bankruptcy inures to the benefit of the honest debtor who supplies creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.

Antonini failed to produce any documents relating to the E*Trade Account despite at least four specific requests from Duran, in the form of notices of Rule 2004 Examinations. Rule 2004 of the Federal Rules of Bankruptcy Procedure permits a creditor or any party in interest to investigate the acts, conduct and financial affairs of a debtor. Two of the requests specifically requested Antonini to produce account information relating to any E*Trade account. The Debtor had the obligation to maintain the records and provide them if lawfully required. The Court finds that Antonini failed to maintain his books and records in a manner that allowed his creditors to ascertain his financial condition. Therefore, the Court will deny his discharge pursuant to §727(a)(3).

### Count VI Damages Awarded Are Non-Dischargeable Pursuant to §523(a)(6)

To prove non-dischargeability under 11 U.S.C. §523(a)(6), Duran was required to show that the injury he suffered was "willful." This requirement is established if the debtor "commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." [D.E. 106] p. 3 (citing *Thomas v. Loveless (In re Thomas)*, 288 Fed. Appx. 547,549 (11th Cir. 2008)). Duran was also required to show malice which "'can be implied when a debtor commits an act that is wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Id*.

In the October 26 Order the Court determined the evidence established: (1) the debtor acted intentionally; (2) the act was substantially certain to cause Duran injury; and (3) the act was wrongful and without just cause, or was excessive. The findings made in the October 26 Order are incorporated herein, to wit, Antonini knowingly and intentionally filed the Involuntary Petition, it was a substantial certainty that Duran would suffer losses and/or harm as a result of Antonini's intentional decision to file the Involuntary Petition, Antonini knew or should have

21

known that, at a minimum, Duran would incur costs and expenses in the defense of the Involuntary Petition and the motion to appoint an interim trustee.

In the October 26 Order the Court also determined that "the commencement of litigation in bad faith can be a sufficient basis for a finding of non-dischargeability of any debt relating to the bad faith or improper litigation." *See* October 26 Order [D.E. 106] at 10. Moreover, the Court identified and cited two cases where §303(i) damages were held to be non-dischargeable pursuant to §523(a)(6) when the petitioning creditor subsequently filed for bankruptcy protection. *See Multiut Corp v. Draiman*, 2006 Bankr. LEXIS 3564 (Bankr. N.D. Ill. Dec. 22, 2006); *Sjostedat v. Salmon (In re Salmon)*, 128 B.R. 313 (Bankr. M.D. Fla. 1991). In analyzing those cases, the Court stated that it found them to be "persuasive." [D.E.106] at 11.

At the conclusion of Duran's case in chief, Antonini moved the Court to make partial findings. The Court made those findings in the October 26 Order, including a finding that Duran had presented sufficient evidence to prevail on this Count. Nothing presented by Antonini at the continued trial leads the Court to change or revise that conclusion. The Court adopts and reaffirms its conclusion in the October 26 Order and the amounts awarded to Duran pursuant to Count I and II are excepted from discharge pursuant to §523(a)(6).

### Antonini's Remaining Defenses and Counterclaim Fail

Antonini argued that Duran's claims are barred by the doctrine of laches because Duran did not timely act to secure his right to recover under section 303(i) and that the Debtor reasonably and justifiably relied upon this delay and materially changed his position as a result thereof. The Court finds Antonini's claim to be without merit as he has failed to demonstrate inexcusable delay and undue prejudice. [D.E. 71] at 5. A finding of laches cannot simply rest on length of delay. *Id*. Duran provided notice of his intent to seek 303(i) damages by reserving his

right in his answer to the Involuntary Petition. *Exhibit 35*. He also filed a limited objection to the motion to dismiss the involuntary case to preserve his 303(i) rights. *Exhibit 7*. Duran filed a motion seeking damages. *See* Exhibit 1 to the Complaint. Duran timely filed a proof of claim in Antonini's bankruptcy case claiming section 303(i) damages [Claim #5], to which no objection has been posed. Duran also timely filed the instant adversary. Accordingly, Antonini had ample notice of Duran's asserted claims under section 303(i). Moreover Antonini failed to introduce a scintilla of evidence that he relied on any delay by Duran and was unduly prejudiced thereby. Accordingly this defense fails.

Antonini also claims that Duran had "unclean hands" and, therefore, is not entitled to any of the relief sought in his complaint. The unclean hands doctrine traditionally applies only to "claims for equitable relief or in opposition to equitable defenses." *Regions Bank v. Old Jupiter, LLC*, No. 10-80188, 2010 WL 5148467, at *6 (S.D. Fla. Dec. 13, 2010) (*citing Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 865 n.26 (5th Cir. 1979)). Therefore, the defense cannot apply to Count I and II as those counts seek to liquidate money damages. Additionally, courts have held that an unclean hands defense is inapplicable to claims made pursuant to §727. *See Giant Eagle v. Monus (In re Monus)*, 167 Fed. Appx. 494, 496 (6th Cir. 2006). Accordingly, the defense fails as matter of law in respect of Counts III-V.

In respect of Count VI, any bad act that Duran may have engaged in is not implicated by the issues raised in Count VI of the complaint. Antonini has provided no evidence to indicate that Duran committed any bad act that should prevent the Court from determining the dischargeability of damages Duran suffered from the Involuntary Petition. Accordingly, this defense fails in its entirety.

Antonini further argues that any debt he may owe Duran should be set off against any debts that Duran may owe Antonini.  However, Antonini has failed to establish that there are any claims that Antonini has against Duran which could or should be set-off.  [D.E. 71] at 7.

Antonini's last remaining claims assert violations of the automatic stay.  First, Antonini asserts that acts taken in Duran's involuntary bankruptcy case after the date Antonini filed his own bankruptcy case violated the automatic stay. It appears that this defense is directed at *Exhibit 8*, the order entered by this Court dismissing the Involuntary Petition and noting that Duran had preserved his rights to seek damages. However, that order did not involve the commencement of an action against the Debtor and the motion to dismiss the Duran Involuntary Case was filed by the chapter 7 trustee of Venuz and was supported by Antonini's own chapter 7 Trustee. Accordingly, entry of that order did not violate the automatic stay.

Antonini further claims the filing of the November 25 motion for damages in the Duran Involuntary Case (*Exhibit KK*) and an alleged lawsuit in Uruguay violate the automatic stay. Although the filing of the motion for damages was a technical violation of the automatic stay, Antonini suffered no damages as a result of the filing and therefore this claim is without impact in this case. *Transcript* 287:9-21. *See 5th Ave. Real Estate Dev., Inc. v. Countrywide Home Loans, Inc.,* 2008 Bankr. LEXIS 2844, at *8 (Bankr. S.D. Fla. 2008).  Moreover, any such violation was immediately rectified by the entry of the order abating such proceedings. *Exhibit 27.* Furthermore, there was no evidence presented that Duran commenced a lawsuit in Uruguay against Antonini after the filing of Antonini's bankruptcy case. Based on the foregoing, the Court finds that the Debtor's claims against Duran fail in their entirety.

In conclusion, as the Court noted at trial, it is sad that two people who were once friends are no longer friends. However, emotions aside, the evidence is undeniable that Antonini abused

24

the bankruptcy system in an attempt to damage his former friend. Those actions violated the law and Duran is entitled to recompense for his damages. Moreover, Antonini's actions in his bankruptcy case warrant the denial of his discharge.   He failed to be honest and forthright with the Court and his creditors.  Pursuant to Fed. R. Bankr. P. 7058 the Court will enter a separate judgment in conformity with these findings and conclusions.

###

**Submitted by:**

Jordi Guso, Esq.
Berger Singerman, P.A.
200 S. Biscayne Blvd, #1000
Miami, FL 33131
Tel: (305)-755-9500
Fax: (305)-714-4340
Email: JGuso@bergersingerman.com

**Copies via CM/ECF upon:**

Jordi Guso, Esq.
Isaac M. Marcushamer, Esq.
James B. Miller, Esq.

4061666-3